ARMSTRONG, Judge.
In this worker’s compensation action, plaintiff, Anthony T. Libasci Jr., appeals from a trial court judgment modifying a recommendation by the Department of Labor, Office of Worker’s Compensation Administration (OWCA) as to weekly compensation benefits. Defendants, Gregg Longo d/b/a Longo’s Welding and Iron Works (Longo), plaintiff’s former employer, and its worker’s compensation insurer, Com *1099 mercial Union Insurance (Commercial), appeal the trial court’s finding that plaintiff was temporarily and totally disabled. We now affirm the judgment of the trial court.
Plaintiff was employed by Longo as a welding foreman when, on February 25, 1987, he was injured while in the course and scope of his employment. A forty foot ladder leaning against the side of a building blew over and struck plaintiff on the head. Commercial began paying worker’s compensation benefits to plaintiff as of the date of the accident in the amount of $212.34 per week, plus costs of medical care. In March 1989 a dispute arose over the benefits to be paid plaintiff. On April 4, 1989 a claim for compensation benefits was filed with the OWCA.
■ The OWCA issued a recommendation on May 2,1989, recommending that temporary total benefits be paid plaintiff from the date of the accident and injury until he is physically able to return to any self-employment or gainful occupation for wages. The OWCA calculated the weekly benefits at $255.34 based on what it determined was plaintiff’s average weekly wage, $383.00. It was further recommended that Commercial pay medical expenses under La.R.S. 23:1203(B), and that plaintiff be reimbursed for travel expenses at the rate of .21c per mile upon submission of a written request pursuant to La.R.S. 23:1203(C). The OWCA further recommended penalties in the amount of 12% under La.R.S. 23:1201(E), and that attorney’s fees be assessed as provided by La.R.S. 23:1201.2, to be paid after submission to the OWCA for approval in accordance with La.R.S. 23:1141. The parties were further informed that a party who failed to notify the Office of a rejection of the recommendation would be conclusively presumed to have accepted it. Neither party rejected the recommendation of the OWCA.
Thereafter, Commercial failed to pay compensation benefits in the amount recommended by the OWCA. Instead, it continued to pay $212.34 in weekly benefits. Commercial also allegedly did not pay medical expenses claimed by plaintiff to have been recommended by his treating physician, or pay the mileage allowance.
On November 16, 1989, plaintiff filed the instant action to enforce the recommendation of the OWCA. Commercial answered, claiming the recommendation of the OWCA was erroneous, praying for a modification of weekly compensation payments, a credit for any overpayments of compensation benefits, an offset for plaintiff’s receipt of any other benefits being received by plaintiff, and a reduction of benefits for voluntary payment of unearned wages. Plaintiff claims that Commercial also filed a petition with the OWCA, seeking a modification of its earlier recommendation. The record does not reflect this fact.
At trial both parties stipulated that the correct amount of benefits should have been $212.34, the amount Commercial had been paying plaintiff. The trial court awarded plaintiff back benefits from February 26, 1987 through January 3, 1990, in the amount of $43.01 per week, the difference between what Commercial had been paying and the amount set by OWCA in its recommendation.[1] However, the trial court went on to find that the figure set by the OWCA was incorrect, and awarded Commercial a credit in the amount of $43.01 per week, for the same period plaintiff was awarded back benefits. As a result, plaintiff was entitled to no back benefits. The trial court also modified the recommendation of the OWCA as to the amount of temporary total disability benefits, reducing it to $212.34, the amount Commercial had been paying, and the amount both plaintiff and Commercial had stipulated before trial was the correct amount. The trial court further ordered Commercial to pay for specified and general expenses, past and future, pay $500.00 in attorney’s fees to plaintiff’s attorney, and the expert witness fees of each medical expert who testified at trial. The trial court specifically declined to assess penalties against Commercial.
Plaintiff’s first claim is that the trial court erred in not strictly enforcing the *1100 terms of the recommendation issued by the OWCA. Following his injury and payment of claims for a period, a dispute arose between plaintiff and Commercial over benefits to which plaintiff was entitled. Plaintiff filed an initial claim with the OWCA under La.R.S. 23:1310. La.R.S. 23:1310.1 provides that the OWCA shall issue a recommendation for resolution of the dispute within thirty days of the receipt of the claim. Under La.R.S. 23:1310.1, any party desiring to reject the recommendation must notify the OWCA in writing within thirty days of the receipt of the recommendation. “A party failing to so notify the [OWCA] shall be conclusively presumed to have accepted the recommendation of the [OWCA].”
In the instant case, a certificate issued by the OWCA reflected that all parties received the recommendation on either May 9 or 10, 1989, and that no party had rejected the recommendation as of the date of the certificate, June 19,1989. Accordingly, the certificate stated that all parties were conclusively presumed to have accepted the recommendation as provided by La.R.S. 23:1310.1. When Commercial did not follow the recommendation it had been conclusively presumed to have accepted, plaintiff’s recourse was the filing of the instant suit to enforce the recommendation.
The parties’ “acceptance” of a recommendation by the OWCA constitutes a contract or conventional obligation because it is an agreement by two or more parties whereby obligations are created. La.C.C. art. 1906; Turner v. Maryland Casualty Co., 518 So.2d 1011 (La.1988). A legal relationship is created whereby the employer, the obligor, is bound to render a performance in favor of the employee, the obligee. La.C.C. art. 1756. An employee’s remedy to enforce the obligation owed by the employer is an ordinary civil action in a court of competent jurisdiction prosecuted according to the rules of civil procedure. Turner v. Maryland, supra.
In the instant case defendants answered plaintiff’s petition to enforce the agreement by praying, in part, for a modification of the recommendation by the OWCA. Plaintiff did not object to this prayer, and at trial defendants proceeded to present evidence on the issue of whether plaintiff was temporarily and totally disabled from working under La.R.S. 23:1221(1) as in effect at the time of his injury. Normally, to seek such a modification of a conclusively presumed accepted OWCA recommendation, a party must file a request for modification with the OWCA pursuant to La.R.S. 23:1331(C). Such a request is treated procedurally as if it were an initial request under La.R.S. 23:1310. Were a party to skip the La.R.S. 23:1331(C) administrative request and file suit in district court for a modification, plaintiff could raise an exception of prematurity under La.R.S. 23:1314(A), again, just as if an initial claim had been filed in district court without an OWCA recommendation having been made. However, the objection is waived if an exception of prematurity is not raised. La.C.C.P. art. 926, 928; Turner v. Maryland, supra; Bailey v. Pacific Marine Insurance Co., 509 So.2d 508 (La. App. 3rd Cir.1987), writ denied, 510 So.2d 377 (La.1987).
We liken the circumstances of this case to a case where a party seeks to prematurely bring an action in district court, but his opposition fails to raise an objection to the suit. In the instant case plaintiff made no objection as defendants tried the case on the merits, calling their own medical expert and a private investigator who testified as to the issue of plaintiff’s disability. Therefore, we believe the trial court properly ruled on the merits of plaintiff’s case. The scope of the proceedings was not limited to the strict enforcement of the terms of the OWCA recommendation or contract between the parties.
Both parties stipulated that, based upon plaintiff’s earnings, he was entitled to $212.33 in weekly compensation benefits. The stipulation by the parties that plaintiff was entitled to $212.33 established that the OWCA recommendation of $255.34 was incorrect in the first instance. La.R.S. 23:1206 provides that an employer may deduct from compensation payments any voluntary overpayment it has made to an em *1101 ployee. This statute contemplates over-payments of compensation benefits. See Breaux v. Petro Drive, Inc., 534 So.2d 48 (La.App. 3rd Cir.1988). The trial court awarded plaintiff the difference in compensation between what defendants had been paying plaintiff and the amount recommended by the OWCA, from the date of injury to date of trial, and then found that this amount would be a voluntary overpayment of compensation, based on the stipulation of the parties. Thus, a credit was properly given under La.R.S. 23:1206. We find no error in the trial court’s action in this regard.
We now address the merits of plaintiffs claim to temporary total disability benefits under La.R.S. 23:1221(1). At the time of plaintiffs injury La.R.S. 23:1221(1) provided:
Temporary total. For injury producing temporary total disability of ah employee to engage in any self-employment or gainful occupation for wages whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time injury was particularly fitted by reason of education, training, or experience, sixty-six and two-thirds percent of wages during the period of such disability.
In reviewing a worker’s compensation case, an appellate court must give great weight to the factual findings of the trial court as to disability. Virgil v. American Guarantee & Liability Insurance, 507 So.2d 825 (La.1987); Dehart v. Betty Breaux Personnel, Inc., 535 So.2d 456 (La. App. 4th Cir.1988). Reasonable evaluations of credibility and reasonable inferences of fact by the trial court, if supported by the record evidence, will not be disturbed on appeal unless the findings are clearly wrong. Virgil, supra; Harris v. Rumold, 518 So.2d 9 (La.App. 4th Cir.1987).
Plaintiff was injured on February 25, 1987, when a forty-foot ladder leaning against a building fell and struck him in the head. He claims that he was knocked unconscious for a few seconds. He subsequently received treatment at a local hospital emergency room. Plaintiff has received continuous medical treatment since the accident. Since the accident plaintiff gets pain running from the neck down to his shoulders where he can hardly lift his shoulders. He gets bad headaches, some causing him nausea. He said he is in pain all of the time. He has numbness in several fingers of his left hand. His lifestyle has changed. He can no longer fish using heavy tackle. He cuts the grass but after-wards he is in a lot of pain. He has difficulty sleeping. He does a little mechanical work on his car, his wife’s car, and relatives’ cars. He does this work at shops owned by friends of his. All of these activities exacerbate his pain. Medication he takes for his condition causes sexual dysfunction. He never had any of these problems before the accident. Plaintiff testified that he could not work without having severe pain.
Plaintiff’s wife of four and a half years, Debra, testified that since the accident plaintiff gets severe headaches, sleeps only three or four hours a night, getting in and out of bed in discomfort throughout the night, and short-tempered because of his discomfort. She hears plaintiff vomit about once a week. She said plaintiff has cut his hand and not even realized it. He works on her car, his car, and the cars of friends on occasion. He cuts the grass, cooks and does the laundry. When she comes home from work and sees the grass has been cut, she says she knows that plaintiff will be in a bad mood because of the pain he will be in.
Dr. Amilcar Correa was plaintiff’s treating physician. Dr. Correa was qualified as an expert in the field of neurosurgery after stipulation by all parties. Part of his practice involved treating patients suffering from chronic pain. He first examined plaintiff on March 13, 1987, after he was referred by a hospital emergency room physician. Plaintiff complained of pain in his neck radiating out to his left arm with numbness of some fingers of his left hand. Dr. Correa initially diagnosed plaintiff as suffering from a sprain of the muscles in *1102 the cervical area and the trapezius muscle. In April 1987 a thermagram test revealed an abnormality. Plaintiff was prescribed muscle relaxants, and non-narcotic pain and anti-inflammatory medications. Plaintiff also began to undergo physical therapy. He complained of headaches and continued numbness and diminished sensation in his left hand. There was still tenderness of the cervical and trapezius muscles. Dr. Correa said that these symptoms were consistent with nerve root irritation.
In June 1987 an EMG test showed chronic neurogenic atrophy at the C7-C8 level of plaintiffs cervical spine. Plaintiff continued to complain of headaches, neck pain, but also, presented new complaints of pain and/or numbness into his lower back and extremity. A June 1987 MRI of plaintiffs cervical spine was normal, as was a repeat MRI done in May 1988, except for minimal arthritic changes which Dr. Correa felt were not particularly important to plaintiffs complaints. A July 1987 CAT scan was normal, as was one done in June 1989. A September 1987 myelogram was normal, as was a repeat one done in June 1989. Dr. Correa never found any muscle atrophy associated with any of plaintiffs complaints.
Plaintiff continued to complain of pain and numbness in his left arm and hand. A June 1989 EMG indicated nerve root pathology. Medication was changed to anti-inflammatory, mild narcotic, and anti-depressant medications. Dr. Correa diagnosed plaintiff as suffering from chronic pain and he stated that depression is not unusual in these types of cases. Despite the normal MRI, myelogram and CAT scans, Dr. Correa felt that plaintiff had sustained a nerve injury. He said that there could be nerve injury without a disc causing it. Nerve injury can be cause by a direct injury to the nerve, Dr. Correa testified. Such nerve root irritation could cause pain, numbness and weakness. He admitted that he was relying heavily upon the plaintiffs complaints of pain and numbness. However, he said the complaints of pain and numbness in particular fingers of his left hand was consistent with EMG results. He said that unless a person had a knowledge of anatomy, he would not be able to fake numbness in specific fingers so as to be consistent with the objective EMG findings. Dr. Correa stated that he had no reason to disbelieve plaintiffs complaints of pain. The results of the myelograms, CAT scans and MRIs simply showed no evidence of compression of nerve roots by a disc. On the advice of Dr. Correa, plaintiff reduced his weight by 70 pounds.
Dr. Correa diagnosed plaintiff as suffering from chronic pain. He cannot say whether plaintiffs condition will deteriorate or improve. He felt that, in the way of future treatment, he would have plaintiff examined by a psychiatrist for possible therapy. He did not know whether a surgical procedure to enlarge the nerve passageway would benefit plaintiff. As to plaintiffs ability to work, he stated that it would be up to how much plaintiff could tolerate.
Dr. Gordon Nutik, an orthopedic surgeon, testified on behalf of defendants. He first treated plaintiff in May 1987. Dr. Nutik found pain on palpation from the Cl level of plaintiffs neck to C7, and over the right and left trapezius muscles. The range of motion in plaintiffs neck was 66% of normal. A neurological exam showed decreased sensation to light touch and pinprick about the left hand in the third, fourth and fifth fingers, left forearm, and left arm. An X-ray of the cervical spine was normal, but showed calcification at C5-C6, and C6-C7 levels of the cervical spine. This was a degenerative change not related to the accident. Dr. Nutik felt that plaintiff had sustained a soft tissue strain in the February 25, 1987 accident. He found no evidence of cervical nerve root irritation. Dr. Nutik examined plaintiff five more times, the last time on August 25, 1987. Throughout the visits plaintiff complained about pain in his neck and Dr. Nutik’s exams showed decreased sensation to light touch about several fingers of his left hand. Dr. Nutik felt that plaintiff could return to light work with an eventual return to regular duties.
On cross-examination Dr. Nutik admitted the possibility of nerve root injury or dam *1103 age at the C7-C8 level and said it would be consistent with some of plaintiffs symptoms. He said that there could be a bruising of a nerve root that would not show up on an MRI.
Dr. Aaron J. Friedman, a neurologist, testified on behalf of defendants. Dr. Friedman first treated plaintiff on July 6, 1987. Plaintiffs complaints were essentially the same as made to Dr. Correa and Dr. Nutik — neck pain, headaches, numbness in his left hand. Dr. Friedman said his neuro-logic exam of plaintiff was normal. Dr. Friedman saw plaintiff five more times, the last visit being October 21, 1987. It was his diagnosis that plaintiff was suffering from a cervical musculo-ligamentous strain. He felt that plaintiff should gradually build back up to working full time. Dr. Friedman admitted that his findings on a pinprick test would be consistent with two EMG tests showing nerve root irritation at the C7-C8 level of plaintiffs cervical spine. He said trauma to a nerve could cause damage and symptoms could be numbness in the ring and little finger.
Plaintiff claimed that he experienced high blood pressure when he was undergoing a myelogram ordered by Dr. Friedman. He related this to the administration of some medication in connection with the test. He said upon his later complaint to Dr. Friedman, he referred plaintiff to another physician. However, Commercial refused to pay for this referral, maintaining that it was not related to the accident and injury. Dr. Friedman testified at trial that as far as he knew, the high blood pressure attack was not related to the myelogram.
Dr. John Schuhmacher, a neurosurgeon, testified on behalf of defendants. Dr. Schuhmacher examined plaintiff once, on October 11,1989. He reviewed X-rays, my-elograms, and MRIs. He found no objective evidence to support plaintiffs complaints. He did say, however, that based on the abnormal EMG, it’s possible there might have been a stretched nerve root injury. However, he felt that plaintiffs complaints were not consistent with the absence of muscular atrophy. It was his opinion that plaintiff could return to work without restriction.
Cecil McKenzie, a private investigator, testified on behalf of defendants. McKenzie made several videotapes of plaintiffs activities at a front-end alignment shop owned by a friend of plaintiffs. One tape showed plaintiff carrying a wrench. One tape showed plaintiff apparently removing a radio from a vehicle in front of the shop. One tape showed plaintiff apparently assisting shop employees by holding a light gauge during an alignment procedure. One tape showed plaintiff moving a pickup truck into the shop. McKenzie testified that plaintiff often arrived at the shop in the morning and did not leave until the evening. The tapes were taken over a period of two months, right before trial.
Plaintiff explained all of the incidents videotaped. He said the owner was a friend of his who was moving out of the state and he was visiting him frequently in the last two months before trial. He said he was observing the employees do alignments, and helping them by, for instance, holding a light gauge, in an effort to learn to do the work when he got better. He also said that he did work on his cars and family’s cars on occasion at the shop. The owner was going to junk one vehicle and told plaintiff he could have the radio if he wanted, so plaintiff removed the dash-mounted radio by removing two screws.
The trial court engaged in extensive questioning of McKenzie. One of defendants assignments of error relates to this questioning. Putting aside the question of the propriety of the court’s questioning this witness so extensively, we find that any error was harmless. First, this was a bench trial. There was no jury to be influenced by the judge’s action. Second, McKenzie’s videotapes and testimony, apart from any testimony adduced in the court’s examination of the witness, was weak evidence as to the issue of plaintiff’s ability to work. Plaintiff had admitted to doing this type of work on his own cars. He testified that he had a number of friends who owned auto repair shops and said he used to visit them during the day *1104 out of boredom. The longest videotape of plaintiff engaged in any type of activity at the shop was approximately 30 minutes. Plaintiffs ability to do something for 30 minutes is not proof that he can engage in gainful employment. He testified that he would be in pain after such activity and could not do it for any extended period. We find no merit to defendant’s argument directed to reversible error because of the trial court’s examination of the private investigator.
The evidence as a whole furnishes a basis for a finding that plaintiff is temporarily and totally disabled from engaging in any self-employment or occupation for wages because he could not do so without significant pain. An employee seeking such a classification is not required to work in pain. Coalgrove v. Spider Staging Sales Co., 530 So.2d 655 (La.App. 4th Cir.1988); Willie v. Balehi Marine, Inc., 525 So.2d 231 (La.App. 1st Cir.1988). We find no error with the trial court’s finding.
The trial court ordered Commercial to pay for a psychological evaluation of plaintiff, and if following the evaluation plaintiff should elect to have surgical intervention, that Commercial pay for the surgery. This is in reference to a foraminotomy wherein Dr. Correa would excise inter-vertebra material to free up the nerve in plaintiff’s cervical spine. All of the evidence, including test results from myelo-grams, MRIs and CAT scans, does not point to an impingement. In fact, the evidence supports the finding that a bruised nerve is causing plaintiff’s problems. Even Dr. Correa could not state that a foraminotomy would help plaintiff. However, the trial court’s order is correct to the extent that Dr. Correa later feels that a foraminotomy is definitely warranted for relief of plaintiff’s pain. Thus, we find no error as to this part of the trial court judgment.
The trial court also ordered Commercial to pay a $105.00 cardiologist’s bill because Dr. Friedman referred plaintiff to him after plaintiff claimed he experienced high blood pressure during a myelogram ordered by Dr. Friedman. Dr. Friedman testified that the high blood pressure was not related to the myelogram. We believe the trial court properly ordered Commercial to pay this bill. It was their physician, Dr. Friedman, who sent plaintiff to the cardiologist. Plaintiff could have reasonably expected that Commercial was going to pay for this examination. However, the trial court properly found that Commercial was not arbitrary and capricious in denying payment of the bill, since it was not conclusively proven that it was actually related to the myelogram or plaintiff’s accident and injury.
Plaintiff assigns as error the trial court’s award of only $500.00 dollars in attorney’s fees and the failure to award penalties.
La.R.S. 23:1201.2 provides for reasonable attorney’s fees when an insurer fails to pay the amount of any worker’s compensation claim within sixty days after receipt of written notice, if the failure to pay is arbitrary, capricious or without probable cause. The trial court awarded attorney’s fees of only $500.00 because, although the suit was to enforce the presumed accepted recommendation of the OWC A, it was admitted by plaintiff at trial that the recommendation had been incorrect. Under these circumstances, we find no error with the trial court’s ruling as to attorney’s fees.
La.R.S. 23:1201 provides for penalties when an employer or compensation insurer fails to make timely compensation payments. For the reasons mentioned above, we cannot say the trial court erred in failing to assess penalties for Commercial’s failure to pay the admittedly incorrect amount recommended by the OWC A, instead of paying the correct amount, $212.34 per week.
For the foregoing reasons, we affirm the judgment of trial court in all respects.
AFFIRMED.
SCHOTT, C.J., dissents.

. The difference was actually $43.00.